# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00189-CV

**Rebecca Svoboda, Appellant**

**v.**

**Larry Svoboda and Maggie Svoboda, Appellees**

## FROM THE DISTRICT COURT OF MILLS COUNTY, 35TH JUDICIAL DISTRICT
## NO. 08-07-6041, HONORABLE STEPHEN ELLIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellees Larry and Maggie Svoboda filed a petition for grandparent possession and access and sought to be named managing conservators of L.R.S., L.K.S., and C.T.S., the children of their son Kevin Svoboda, who is deceased, and appellant Rebecca Svoboda.[1]  The trial court ordered that Larry and Maggie be awarded possession of the children for specified periods during the Christmas, spring break, and summer holidays and appointed Larry and Maggie as possessory conservators of the children "during their court-ordered periods of possession."  Rebecca appeals, arguing that the trial court abused its discretion in naming Larry and Maggie possessory conservators and in granting Larry and Maggie's petition for grandparent access.  We reverse and dismiss in part and reverse and render in part.

---

[1] Because the parties share a common surname, we will refer to them by their first names to avoid confusion.

## BACKGROUND

Kevin and Rebecca were married in 1990. During their marriage, they had three children, L.R.S., L.K.S., and C.T.S. At the time of Kevin's death in 2007, the children were aged eight, five, and three. On July 21, 2008, Kevin's parents, Larry and Maggie, filed their original petition seeking to be named sole managing conservators of the children based on their belief that Rebecca's care of the children subjected them to an environment that presented a serious risk to their physical health and emotional well-being. In the alternative, Larry and Maggie sought grandparent access for visitation, arguing that denying them access to the children would significantly impair the children's physical health and emotional well-being.

The trial court held a hearing on February 25, 2009. During the first part of the hearing, the trial court heard testimony concerning the issue of Larry and Maggie's standing to bring an original suit to be named managing conservators of the children. *See* Tex. Fam. Code Ann. § 102.004(a)(1) (providing that grandparents may file original suit requesting managing conservatorship if they produce satisfactory proof that order requested is necessary because child's present circumstances would significantly impair child's physical health or emotional development).

Maggie testified that although she and her husband live in North Dakota, a great distance from Rebecca and her children in Mills County, they had always been involved in the children's lives and had a close relationship with them.[2] She stated that she and Larry made frequent visits to Texas to help Kevin and Rebecca when they were moving and making home repairs,

---

[2] During the first years of their marriage before they moved to Texas, Kevin and Rebecca lived close to his parents, first in North Dakota and later in Minnesota.

particularly after Kevin was diagnosed with cancer, and that they helped Rebecca financially after Kevin died. Maggie testified that she believed she was being forced out of the children's lives in a way that was damaging to the children and that preventing her from having access to the children would impair their emotional and physical development.[3] She further testified that she had concerns about L.R.S. regarding a possible but unsubstantiated incident of sexual abuse by a male child at her daycare. Maggie stated that she had been given no information regarding the incident, but she worried that the environment L.R.S. is in may be dangerous because L.R.S. might not be receiving counseling and might "never be mentally coping in the world."[4] She explained that she had no way

---

[3] Maggie testified:

> We're very close to the children and we love them and they love us. And this is all we have left of Kevin. And they need our closeness, be[cause] they lost their daddy. If they had any questions about their father, we could answer if they wanted to. . . . And it would hurt them deeply not to be able to see us again. They have lost their father already. . . . That is just very, very difficult for children to have to cope with.

[4] At the hearing, the subject of L.R.S.'s prior abuse was raised when Maggie testified that she had read the family grief counselor's notes from Rebecca's session, which stated that Rebecca "is concerned for [L.R.S.] who has been reluctant to go to daycare or spend time with her male cousins. [Rebecca] is concerned that something has triggered her daughter's past molestation by a male peer at daycare." Maggie was then questioned further regarding her concerns that the incident had not been dealt with appropriately:

> Q.    Now, we have a stack of counseling notes that are going to be available to the Court later on. Possibly this has been addressed, but we have no way of knowing, do we?
>
> A.    No, we don't, sir.
>
> Q.    We don't know whether this was from a lack of supervision—
>
> A.    No, sir.
>
> Q.    —or who may have molested her or anything?
>
> A.    No, sir.

3

of knowing whether L.R.S. was receiving the therapy she needed. She further stated that Rebecca had cut off her home telephone line and did not stay in frequent contact with her and Larry.

Asked about the event that precipitated their filing the petition for conservatorship, Maggie explained that in March 2008 she and Larry traveled to Texas and attempted to see the children. She recounted that Rebecca refused to let them see the children unless they signed "a paper" stating that they agreed not to medicate the children or remove them from Brown or Mills County. Maggie testified that she did not sign the paper because Rebecca's own parents had not been required to do so and because she felt that, by signing it, she would be admitting guilt for having overmedicated the children in the past.

Maggie also testified about the children's performance in school. She stated that she believed L.R.S. had been diagnosed with dyslexia and that both L.R.S. and L.K.S. had been held back a year in school. Asked whether she thought not passing in school reflected something about their environment that may be endangering the children's emotional and physical development, Maggie answered:

> Yes, I do. I don't believe they are getting the rest they should have. They have to get up way too early in the morning. They don't get their rest or the time to do the schoolwork that they need to do. [L.R.S.] has all of these chores that she has to do when she gets home and chores before she goes to school. And they have to get up at 5:00 in the morning in order—they had to get up at 5:00 in the morning in order for [Rebecca] to be at work at 8:00.

She stated that the children's teeth were not well taken care of and that often they did not have toothbrushes or they had to share toothbrushes. Finally, Maggie discussed the emotional support that she and her family would offer the children to help them deal with their father's death, noting that

4

Rebecca did not want her or Larry to speak to the children about their father because she felt that it would upset them too much.

Larry testified, in very general terms, that he believed depriving the children of a relationship with him and Maggie would significantly impair the children's emotional and physical well-being. Larry and Maggie's son Shelley and daughter Petrina also testified, stating that Larry and Maggie had been an important part of the children's lives. They testified, also in very general terms, that they believed it would significantly impair the children's emotional well-being to deny them time with their paternal grandparents. On cross-examination, both Shelly and Petrina testified that Rebecca had never denied them access to the children and that they had always had a fairly good relationship with Rebecca.

At the close of this testimony, the trial court ruled on the standing issue, finding that Larry and Maggie had met the standing requirements of the Texas Family Code because they had shown by a preponderance of the evidence that denial of possession or access to the children would significantly impair the children's emotional well-being. The court further found, however, that there was no evidence that Rebecca was unfit as a mother or that the children were in any physical danger.

During the second portion of the hearing, the trial court heard evidence on the issues of conservatorship and possession. Rebecca testified extensively concerning her strained relationship with her in-laws, particularly Maggie, and about her efforts to ensure that Larry and

Maggie's visits with her children conformed with how she and Kevin wished to raise their children.[5]
She also discussed how the parties had struggled to agree to a visitation schedule after Kevin passed away and that she repeatedly avoided Larry and Maggie's requests to have the children visit them in North Dakota because she felt the children were not old enough to travel that far by themselves. Rebecca also described her version of the events that led to Larry and Maggie's filing their petition for conservatorship and access. She said that Larry and Maggie had traveled to Texas in March to see the children and a dispute arose when they refused Rebecca's request that they agree in writing to certain conditions that she and the family's grief counselor had determined were necessary for appropriate visitation to occur. The two subsequent visits were supervised at the Family Services Center. Larry and Maggie both acknowledged on cross-examination that unsupervised visits would have been possible if they had agreed to the guidelines that Rebecca had requested.[6]

Rebecca also responded to Maggie's testimony that the children were performing poorly in school. She stated that L.R.S. had attention-deficit disorder, not dyslexia; that none of her children had been held back in school; and that all of the children had satisfactory report cards and

---

[5] Rebecca repeatedly stated that Maggie feels "like she needs to be in control of every part and person in her life. And she is not willing to respect the fact that I am these kids' mother." The trial court heard a great deal of testimony regarding Rebecca's concerns that Maggie and Larry gave the children toys and allowed them to watch television programs that she felt were inappropriate and inconsistent with her religious beliefs; that Maggie had overmedicated or provided inappropriate medication to the children; and that Maggie and Larry made comments to the children about their father that upset them.

[6] The document that Rebecca had requested Larry and Maggie to sign stated that Maggie, in order to visit with the children, had to agree: (1) not to medicate the children for any reason without prior consent from Rebecca; (2) not to allow the children to leave Mills or Brown County; (3) not to have any negative discussions utilizing dramatic expressions or make statements that made the children feel guilty about their father's death; and (4) to abide by Rebecca's decisions regarding toys, movies, and clothing.

were performing at or above their grade level. Rebecca further testified that she and her children were very involved in their church, had an "amazing" support system, and met weekly with a counselor for several months after Kevin passed away. Rebecca stated that the children had all been released from the counselor's care because of their progress. She testified that although she wanted her children to have a relationship with Kevin's family, she felt that she should be able to decide what visitation would be appropriate and what boundaries should be set. Rebecca acknowledged that although she had disconnected the telephone line at her house, Maggie and Larry could still contact her by e-mail and reach her and the children on her cell phone.

After both sides rested, the trial court ruled on the conservatorship issue. The court named Rebecca sole managing conservator and named Larry and Maggie possessory conservators during the times of their possession, beginning with a three-day visitation during the 2008 Christmas holiday. The court ordered that Larry and Maggie be granted all the privileges and powers of possessory conservators under the family code during their periods of possession, with the caveat that they could not give the children any medication without Rebecca's prior approval, except in an emergency. This ruling was memorialized in the court's final written order, which granted Larry and Maggie possession of the children during each Christmas and spring break and for two weeks during the summer, as well as access through monthly telephone calls during every month in which no periods of possession were ordered. Rebecca appeals, arguing that the trial court erred in (1) naming Larry and Maggie possessory conservators, (2) determining that Larry and Maggie had standing to bring suit for conservatorship, (3) awarding Larry and Maggie court-ordered periods of possession

and access, and (4) finding that Rebecca was a fit parent but then failing to apply the presumption that a fit parent acts in her child's best interest.

## STANDARDS OF REVIEW

Whether a party has standing to bring suit is a legal question that we review de novo. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). In Texas, standing in the context of a suit affecting the parent-child relationship is governed by the family code; a party seeking relief in such a suit must plead and establish standing within the parameters of the language used in the code. *See* Tex. Fam. Code Ann. §§ 102.003-.007 (West 2008). We review the trial court's determination of a party's standing to file a suit affecting the parent-child relationship by construing the pleadings in favor of the petitioner and looking to the pleader's intent. *In re M.J.G.*, 248 S.W.3d 753, 757 (Tex. App.—Fort Worth 2008, no pet.); *In re SSJ-J*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet.).

We apply an abuse-of-discretion standard in reviewing a trial court's determination of grandparent access or possession under section 153.433 of the family code. *In re J.P.C.*, 261 S.W.3d 334, 335-36 (Tex. App.—Fort Worth 2008, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding rules or principles. *In re J.R.D.*, 169 S.W.3d 740, 743 (Tex. App.—Austin 2005, pet. denied). A trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). Therefore, a trial court abuses its discretion when it grants access to a grandparent who fails to meet the statutory requirements of section 153.433. *J.P.C.*, 261 S.W.3d at 336.

8

## DISCUSSION

In her first and second issues, Rebecca argues that Larry and Maggie lacked standing "to sue for custody—*i.e.*, sole managing conservatorship, joint managing conservatorship, or possessory conservatorship," and that the trial court therefore erred in naming Larry and Maggie possessory conservators. Larry and Maggie sought by their original petition to be named sole managing conservators of the children. The trial court, after hearing the testimony of Larry and Maggie and their children, Shelley and Petrina, found that "the grandparents have shown and established by the preponderance of the evidence that that denial of possession or access to their grandchildren would significantly impair the grandchildren's emotional well-being." Accordingly, the court determined that Larry and Maggie had standing to file an original petition seeking managing conservatorship.

As an initial matter, we note that the trial judge's oral findings and written order both reflect that he ruled on the standing question under section 153.433 of the family code. Section 153.433, as will be discussed in connection with Rebecca's remaining issues on appeal, governs the circumstances under which grandparents may seek *possession* of or *access* to their grandchild contrary to the parent's wishes. *See* Tex. Fam. Code Ann. § 153.433 (requiring, among other elements, that grandparent prove by preponderance of evidence that denial of possession of or access to child would significantly impair child's physical health or emotional well-being). A grandparent's *standing* to bring an original suit affecting the parent-child relationship, on the other hand, is governed by section 102.004(a) of the family code, which requires that the petitioner present satisfactory proof that "the order requested is necessary because the child's present

9

circumstances would significantly impair the child's physical health or emotional development." *Id.* § 102.004(a)(1). Nonetheless, because it is clear from the context that the trial judge intended to make the requisite finding related to the standing issue, we will also treat the trial court's finding as one made under section 102.004—*i.e.*, that Larry and Maggie had standing to bring the conservatorship suit because the children's present circumstances would significantly impair their emotional development. *See id.* § 102.004(a)(1).

We disagree with the trial court, however, that the evidence supports Larry and Maggie's standing to file an original suit seeking conservatorship of the children. "[A] grandparent has standing to bring a suit affecting the parent-child relationship only in certain extreme circumstances." *Von Behren v. Von Behren*, 800 S.W.2d 919, 921 (Tex. App.—San Antonio 1990, writ denied). The legislature, recognizing the potential for disruption posed by the filing of an original suit for conservatorship, set a high burden for petitioners to meet in grandparent-initiated suits. *See, e.g.*, *Whitworth v. Whitworth*, 222 S.W.3d 616, 622 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (noting that "the statutory scheme assures that grandparents are not entitled to disrupt the child's family life and initiate suits for managing conservatorship except in limited circumstances); *Harrison v. Harrison*, 734 S.W.2d 737, 740-41 (Tex. App.—Eastland 1987, no writ) ("There is a significant difference between filing an original proceeding which could disrupt the children's relationship with their parents and intervening in a pending suit in which that relationship had been sufficiently interrupted to cause the filing of a suit requiring the courts to decide what decree would be in the children's best interest.").

10

In determining standing, we examine the children's "present circumstances" as of July 21, 2008, the date Larry and Maggie filed their petition. *See In re Vogel*, 261 S.W.3d 917, 922 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 n.9 (Tex. 1993)). The trial court found that the children were not subject to any physical harm, and Larry and Maggie do not contest this finding. As to the children's emotional development, the record does not contain more than a scintilla of evidence that the children risked significantly impaired emotional development in their present circumstances. The children's "present circumstances" entailed residing with their mother, whom the trial court determined to be a loving and "fit" mother, and having limited contact with their paternal grandparents. Although Larry and Maggie testified that they believed it was in the children's best interest for them to have contact with their late father's family and that depriving the children of a relationship with their paternal grandparents would be harmful to the children's emotional well-being, the record establishes that the children were *not* completely deprived of contact with their father's family. On the contrary, Maggie testified that she had access to the children by phone—including Rebecca's cell phone—and that, even after the dispute in March 2008, she and Larry were permitted to have supervised visitation with the children at the Family Services Center. Furthermore, Maggie acknowledged that if she had agreed to the conditions Rebecca sought to impose on her behavior, she would have been allowed unsupervised visitation. Shelley and Petrina, the children's paternal uncle and aunt, also testified that they had never been denied possession of or access to the children.

In addition, Maggie's statements that she was concerned whether the children, L.R.S. in particular, were receiving appropriate counseling and whether they were coping with their father's death are not evidence that the children's present circumstances posed a significant threat to their emotional development. Mere speculation that the children's emotional well-being might be at risk is not sufficient proof to confer standing under section 102.004(a). *See Von Behren*, 800 S.W.2d at 922-23 (grandmother's allegation that grandchild might have been sexually abused by her father was insufficient to confer standing).

On this record, we conclude that the trial court erred in determining that the children's present circumstances posed a significant danger to their emotional development. *Compare In re M.J.G.*, 248 S.W.3d 753, 760 (Tex. App.—Fort Worth 2008, no pet.) (evidence of grandparents' significant relationship with grandchildren did not support standing under section 102.004(a) in light of absence of testimony that children's mother did not also perform parenting duties or that grandparent-grandchild relationship was so essential to children's well-being that they would be physically or emotionally harmed if they did not live with grandparents), *with Vogel*, 261 S.W.3d at 922 (grandparent had standing based on testimony that child's father was long-term alcoholic who could not financially provide for child's needs and that it would be "harmful" for child to live with his father), *and In re R.D.Y.*, 51 S.W.3d 314, 318-19, 325 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (grandmother had standing under section 102.004 when record showed that mother physically abused child, was homeless and unemployed, did not feed or bathe child, and was involuntarily committed to psychiatric treatment facility). Accordingly, we hold that Larry and Maggie lacked standing to bring their original petition

seeking to be named managing conservators of the children and that the trial court erred in naming Larry and Maggie possessory conservators.[7]  We sustain Rebecca's first and second issues.

In her remaining issues, Rebecca argues that the trial court erred in granting Larry and Maggie possession of and access to the children.  Possession of or access to a child by a grandparent is governed by the standards set forth in chapter 153 of the Texas Family Code.  Tex. Fam. Code Ann. § 102.004(c) (West 2008); *In re Chambless*, 257 S.W.3d 698, 700 (Tex. 2008).  The specific statute applicable to this appeal is section 153.433.  The legislature amended section 153.433 in 2005 in an effort to bring the Texas statute into compliance with the U.S. Supreme Court's decision in *Troxel v. Granville*, 530 U.S. 57 (2000) (plurality opinion).  *See In re Derzapf*, 219 S.W.3d 327, 333 (Tex. 2007).  The Supreme Court held in *Troxel* that parents enjoy a fundamental right to make decisions concerning "the care, custody, and control of their children," and that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family."  530 U.S. at 65, 68.

In light of *Troxel*, family code section 153.433 now requires that a grandparent seeking court-ordered possession or access overcome the presumption that a parent acts in his or her child's best interest, meaning that the grandparent must prove by a preponderance of the evidence

---

[7]  The family code provides that a grandparent may not file an original suit requesting *possessory* conservatorship.  *See* Tex. Fam. Code Ann. § 102.004(b) (West 2008).  Because Larry and Maggie filed a petition for *managing* conservatorship, however, which resulted in the trial court appointing Rebecca as sole managing conservator, the trial court was then permitted to appoint Larry and Maggie possessory conservators of the children.  *See id.* § 153.006 (West 2008) (providing that trial court may appoint one or more possessory conservators if it appoints a managing conservator).  The necessary result of our holding that Larry and Maggie lacked standing to bring a suit for conservatorship is that the trial court had no basis to appoint a managing conservator and, therefore, no authority to appoint possessory conservators.

13

that denial of access to the child would significantly impair the child's physical health or emotional well-being. Tex. Fam. Code Ann. § 153.433(2); *Derzapf*, 219 S.W.3d at 333. "This high threshold exists so that a court will refrain from interfering with child-rearing decisions made by a parent simply because the court believes that a 'better decision' could have been made." *J.P.C.*, 261 S.W.3d at 337. Under the statute, a trial court must presume that a fit parent acts in his or her child's best interest, and the court abuses its discretion if it grants access to a grandparent who has not met this standard. *Derzapf*, 219 S.W.3d at 333. The Texas Supreme Court has interpreted *Troxel* to mean that when there is no evidence that (1) the child's parent is unfit; (2) the child's health or emotional well-being would suffer if the court defers to her decisions; and (3) the parent intended to exclude the grandparent's access completely, a trial court abuses its discretion by granting grandparent access against the parent's wishes. *See In re Mays-Hooper*, 189 S.W.3d 777, 778 (Tex. 2006) (per curiam).

Rebecca argues on appeal that the *Mays-Hooper* analysis applies in this case, that Larry and Maggie failed to overcome the presumption that she acted in the children's best interest, and that the trial court's order granting Larry and Maggie possession and access was therefore an abuse of discretion. We agree. As discussed in connection with Rebecca's first two issues, the record establishes that Rebecca is a fit parent, as the trial court expressly found, and that she did not intend to exclude Larry and Maggie's access to the children completely. Moreover, there is no support for the claim that the children's physical health or emotional well-being would be significantly impaired if the court deferred to Rebecca's decision to impose certain limitations on Larry and Maggie's visitation. There is simply no evidence that the visitation and phone access

14

Larry and Maggie had prior to filing their petition—while less frequent and more restricted than they would have liked—was harming the children. *Cf. J.P.C.*, 261 S.W.3d at 339 (grandparents' opinion that regular, unsupervised visits would be better and that it would be impossible to establish regular visits without court order "are only reflections of the grandparents' fears and speculations and do not support the trial court's finding that the grandparents overcame the statutory presumption").

As a fit parent, Rebecca is entitled to ask that Larry and Maggie comply with her wishes regarding medication, appropriate toys and movies, and conversation about the children's father that she deems acceptable. The mere opinion of the grandparents themselves as interested, nonexpert witnesses that they should be granted access does not overcome the statutory presumption imposed by section 153.433, nor does it support the court's interference with a parent's rights. *Id.* at 340. We therefore hold that the trial court abused its discretion in ordering that Larry and Maggie be awarded possession and access. We sustain Rebecca's remaining issues.

## CONCLUSION

Having determined that Larry and Maggie lacked standing to file an original petition for conservatorship, we reverse the portion of the trial court's order naming them possessory conservators of the children and dismiss their petition for conservatorship for lack of jurisdiction. Further, because the trial court abused its discretion in awarding Larry and Maggie possession of and access to the children, we reverse the remainder of the trial court's order and render judgment denying their petition for possession and access.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Reversed and Dismissed in part; Reversed and Rendered in part

Filed:   October 1, 2009